UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-61391-CIV-DIMITROULEAS/SNOW

CHERRIE WALTON,

          Plaintiff,

v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

          Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (ECF No. 39), pursuant to the Order Referring Proceedings Supplementary entered by the Honorable William P. Dimitrouleas. (ECF No. 22) The motion has been fully briefed.

## I. BACKGROUND

This is an action for proceedings supplementary to execution, pursuant to Fla. Stat. § 56.29. The action was removed to this Court on July 12, 2017, by Defendant St. Paul Fire and Marine Insurance Company on the basis of the parties' diversity, pursuant to 28 U.S.C. § 1332. The action was filed in state court approximately ten years earlier, in December 2007, by Cherrie Walton against her former employer Internet Advertising Group, Inc. (IAG), and her former supervisor, Omar E. Dames, alleging, *inter alia*, that IAG's negligence caused Plaintiff to be subject to sexual assault by Mr. Dames, resulting in lost wages, humiliation and other damages. St. Paul was impleaded in the action in late May 2017.

According to the Third Amended Complaint filed before the state court in June 2009, IAG negligently hired and retained Mr. Dames, who then sexually assaulted Ms. Walton in August 2007 while he was her supervisor at IAG. After a trial, the jury entered a verdict for Plaintiff against IAG and Mr. Dames on June 7, 2016, in the amount of $565,000 for past and future lost earnings

and medical expenses, plus $217,500 for pain and suffering, and an additional $217,500 for damages resulting from Defendants' intentional infliction of emotional distress, for a total award of $1,000,000. (ECF No. 25-2) Final judgment was issued approximately one year later, on August 21, 2017. (ECF No. 31-1)

On May 8, 2017, after the verdict but prior to entry of final judgment, Plaintiff filed a Motion for Proceedings Supplementary and to Implead Non-Party St. Paul, pursuant to Fla. Stat.§ 56.29, based on an insurance policy issued by St. Paul to IAG. On May 23, 2017, the state court granted Plaintiff's request for proceedings supplementary and issued a Notice to Appear to St. Paul, which was served on St. Paul on June 22, 2017. (ECF Nos. 1-2, 1-3, ECF No. 1, at ¶ 4) St. Paul removed the proceedings supplementary to this court three weeks later.

On July 20, 2017, one week after removing this case, St. Paul filed a new case in this court, Case No. 17-61445-CV, seeking a declaration that the insurance policy it had sold to IAG did not provide coverage for the judgment obtained against IAG and Mr. Dames by Plaintiff. The next day, St. Paul filed a Motion to Dismiss these proceedings supplementary, arguing that allowing this case to proceed while its subsequently filed declaratory judgment action was pending "would negatively transform insurance coverage litigation in Florida," in a way "that no court or judge has held in over fifty years." (ECF No. 10) On August 9, 2017, the Honorable William P. Dimitrouleas entered an Order striking, as procedurally inappropriate, St. Paul's Motion to Dismiss, finding that Plaintiff was entitled to proceedings supplementary and directing St. Paul to file a response to Plaintiff's Notice to Appear, as required by Fla. Stat.§ 56.29. (ECF No. 22)

St. Paul asserted in the declaratory action, and here, that it had no duty to defend, nor to indemnify, its insured IAG in the underlying state case because it had untimely notice of the claims, and also because Plaintiff's claim was excluded from coverage under the policy's "Employers liability" exclusion. IAG, which had voluntarily dissolved years earlier, never appeared in the declaratory action, nor was Mr. Dames ever served. Ms. Walton was named as a defendant in the

declaratory action and appeared in that case to seek its dismissal in favor of the already-pending proceedings supplementary. Her motion to dismiss, filed immediately prior to the entry of a Final Default judgment as to IAG, was never adjudicated.

St. Paul had been ordered in the declaratory action to report whether there was a possibility of inconsistent liability and was cautioned that "[o]nce liability is resolved as to all Defendants, [St. Paul] may move for the entry of default final judgment" (Case No. 17-61445-CV, Order, Sept. 29, 2017). This should have triggered St. Paul to advise the Court of the pending proceedings supplementary and the undecided issue of insurance coverage affecting the rights of Ms. Walton, a defendant in the declaratory action, but St. Paul failed to do so.[1] As a result, on October 20, 2017, more than two months after Judge Dimitrouleas had authorized these proceedings supplementary to proceed against St. Paul, another judge of this court entered a Final Default Judgment in favor of St. Paul in the declaratory action, finding that St. Paul "had no duty to defend the underlying lawsuit and has no duty to indemnify Defendant IAG for the judgment rendered in the underlying lawsuit." (Case No. 17-61445-CV, ECF No. 24) After obtaining the default judgment it had proposed, St. Paul dismissed the declaratory action.

Pursuant to the scheduling order entered in this case on August 16, 2017, with calendar call set for September 7, 2018, the parties' deadline for filing substantive motions was June 15, 2018. St. Paul filed its Motion for Summary Judgment in this case on June 15, 2018, arguing the same two reasons previously asserted for why it is not responsible for the judgment obtained by Plaintiff: St. Paul's insured failed to provide timely notice and such failure prejudiced St. Paul, and

---

[1] Defendant's Motion for Default Judgment filed on October 6, 2017, in Case No. 17-61445 does not mention the pending proceedings supplementary in the present case. St. Paul argued that "there is no risk of inconsistent verdicts in this case.... either there is coverage or there is not. St. Paul's coverage position is the same with respect to all three defendants.... Even if IAG, Dames [whom had not yet been served in that case], and Waltoner [sic] were to take inconsistent positions, the ultimate outcome would necessarily be consistent among all of the defendants." (Case No. 17-61445-CV, ECF No. 21)

regardless of whether notice had been timely, there is no coverage for Plaintiff's claims of bodily injury under the policy's "Employer liability" exclusion.[2]

## II. JURISDICTION

Although neither party has raised the issue, district courts are "obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." Univ. of South Alabama v. Am. Tobacco Co., 168 F.3d 405 (11th Cir. 1999). When a case has been removed from state court, the district court is required to remand a case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C.§ 1447(c). The Court's review of these proceedings supplementary, removed to this court by St. Paul, reveals a lack of subject matter jurisdiction over the parties' dispute.

A. This proceeding supplementary is dependent upon the tort action and is not a "civil action" subject to removal under 28 U.S.C. § 1441

St. Paul removed this proceeding supplementary on July 12, 2017, asserting that this Court has original jurisdiction under 28 U.S.C. § 1332. In its Petition for Removal, St. Paul asserts that it complied with 28 U.S.C.§ 1446 by filing the petition for removal "within 30 days of being served with the trial court's Notice to Appear which gave the basis for removal," and that the request for removal was filed "within one year from the date that the Notice to Appear was filed and served." (ECF No. 1, at ¶¶ 15-16) St. Paul's assertion reveals that it construes these proceedings supplementary as an independent "civil action," removable based on St. Paul's diversity of

---

[2]St. Paul filed its dispositive motion on the final day permitted, despite having a copy of the insurance policy, and a copy of Plaintiff's pleading since at least June 2017, the two documents which control the question of whether St. Paul had a duty to defend IAG. See, e.g., Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So.2d 435, 442-43 (Fla. 2005) (coverage determinations are based upon allegations in pleading in underlying tort action). In addition, as to St. Paul's argument that it was not timely notified by IAG, Defendant relies on its employee's affidavit, which is dated August 11, 2017. Nevertheless, Defendant waited until June 15, 2018, to file the instant motion.

citizenship from Ms. Walton, under 28 U.S.C. §§ 1332, 1441. That construction of these proceedings is incorrect under Florida and federal law, which provide that a proceeding supplementary brought under these circumstances is dependent upon the underlying tort litigation and is not a new civil action.

In Florida, a judgment creditor with an unsatisfied judgment is entitled to institute proceedings supplementary to execution pursuant to Fla. Stat.§ 56.29. The action is "designed to avoid the necessity of a judgment creditor initiating an entirely separate action," and allows the creditor to implead third parties, with assets which may be subject to her judgment, in a "speedy and direct proceeding in the same court in which the judgment was recovered." Regent Bank v. Woodcox, 636 So. 2d 885, 886 (Fla. 4th DCA 1994) (citations omitted). In relevant part, the statute provides that a judgment creditor need only file a motion and affidavit identifying the unsatisfied judgment and attesting to the validity of the execution in order to be entitled to proceedings supplementary to execution. Fla. Stat.§ 56.29(1). The motion, or a supplemental affidavit, must describe any property or obligation owed to the judgment debtor which may be applied toward satisfaction of the judgment and which is in the control of another person. Upon filing of such information by the judgment creditor, the court "shall issue" a Notice to Appear. Fla. Stat.§ 56.29(2). The statute provides that supplemental proceedings, including those brought to recover assets fraudulently transferred in an attempt to avoid execution, are to be docketed "under the same case number assigned to the original complaint filed by the judgment creditor," and shall be assigned "to the same division and judge assigned to the main case." Fla. Stat. § 56.29(9).

Proceedings supplementary to execution, pursuant to Fla. Stat. § 56.29, are not independent actions. Such proceedings are "a continuation of the initial, underlying proceeding" and venue "remains with the court which entered the judgment." State of Fla., Dep't of Ins. v. Accelerated Benefits Corp., 817 So.2d 1086, 1088 (Fla. 4th DCA 2002). A review of the decision in Accelerated Benefits Corp. highlights the principle that proceedings supplementary remain in the court in which

the underlying judgment was awarded. In that case, Florida's Department of Insurance was impleaded as a defendant under Fla. Stat. § 56.29 as a result of a bond which a judgment debtor had posted with the Department and which the judgment creditor sought to attach. The state agency's request to transfer the proceedings to a venue closer to the agency's headquarters, pursuant to the home venue privilege accorded to state agencies, was denied, due to the risk that transfer to a different venue "would result in new and additional litigation in a different court." Id. In other words, the priority of remaining before the original court, which could more readily and expeditiously resolve the issues, was sufficient reason to overcome the home venue privilege of a state agency.

Even if the state court which presided over Ms. Walton's tort trial was not the statutorily designated location for these proceedings supplementary, there are practical reasons for returning this proceeding supplementary to the state court. The resolution of the issues framed by St. Paul in this proceeding supplementary to execution depend upon the tort litigation which occurred in the state court prior to removal. For example, St. Paul's argument that it is not responsible for Plaintiff's outstanding judgment rests upon St. Paul's assertion that it owed no duty in the underlying tort litigation. To establish it had no duty to defend IAG St. Paul must succeed on at least one of its two arguments: (1) that the allegations of Plaintiff's pleading did not state a claim covered by the insurance policy IAG obtained from St. Paul, or (2) even if the claim would have been covered, St. Paul has no duty because it was prejudiced by its insured's failure to provide timely notice of the claim. Plaintiff's tort pleading will control whether the claim was covered under the policy and, if notice is found to have been untimely, the question of prejudice will depend on what transpired in the tort litigation and how the outcome of that litigation did or did not result in prejudice to St. Paul.

The state court presiding over the tort litigation has a more informed perspective on that litigation, and how it relates to the proceeding supplementary to execution, than a federal court will be able to gain even after studying the record and conducting a bench trial years later. In

summary, the determination of whether Defendant St. Paul holds an "obligation due to the judgment debtor which may be applied toward the satisfaction of the judgment," pursuant to Fla. Stat.§ 56.29(2), is entirely dependent on the tort litigation and is not an independent action even though St. Paul is a newly added party.

In contrast to the present case which involves a judgment creditor's attempt to obtain relief from a judgment debtor's insurance policy, proceedings supplementary brought under the fraudulent transfers subsection of Fla. Stat.§ 56.29 are deemed independent civil actions subject to removal upon their initiation. In Jackson-Platts v. General Elec. Capital Corp., 727 F.3d 1127 (11th Cir. 2013), the court addressed the subsection of the Florida proceedings supplementary statute addressing transfers of assets of a debtor allegedly made to defraud future creditors (the provision was numbered § 56.29(6), and presently is § 56.29(3)). The Eleventh Circuit noted that claims filed under that provision are governed by Florida's Uniform Fraudulent Transfer Act, Fla. Stat. § 726.108, which imposes liability based on factors "wholly unrelated to the underlying tort action," and that Florida courts have treated such proceedings as a substantive, independent action. Id. at 1137-38. Indeed, as the court observed, such proceedings might entitle a third party to a jury trial, not normally provided in proceedings supplementary. Id. at 1138.[3]

---

[3]The issue before appellate court in Jackson-Platts was whether a district court had properly abstained from exercising jurisdiction over the fraudulent transfer-related proceedings supplementary under the doctrine of abstention announced in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). The underlying tort litigation in Jackson-Platts related to wrongful death resulting from negligence by a nursing home, while the proceedings supplementary related to asset transfers designed to insulate the assets of the owners of the nursing home from any creditors. Arguably, any general observations regarding the nature of proceedings supplementary in Jackson-Platts are dicta, as the decision in the case rested on the court's determination that the lower court abused its discretion in abstaining from the exercise of jurisdiction. See, e.g., Katzman v. Comprehensive Care Corp., 2017 WL 4944802 (M.D. Fla. Nov. 1, 2017) (granting motion to remand after competing judgment creditor intervened and removed action, as removal was untimely and also failed to include all defendants, and also granting motion to remand even if the intervenor only sought to remove the proceedings supplementary, as it was only an "auxiliary dispute not susceptible to removal").

As detailed above, the action before this Court "[b]y its very nature ... is not an independent action that could have been filed in federal court" and, because removal of an action is only permissible as to a claim which could have been filed in federal court originally, remand is required. Blue Cross and Blue Shield of Fla., Inc. v. ADCAHB Medical Coverages, Inc., No. 3:17-CV-865-J-39-PDB, 2018 WL 3599009 (M.D. Fla. March 13, 2018) (court was "powerless to exercise jurisdiction over" improperly and untimely removed proceeding supplementary).

Because this court lacked original jurisdiction over this proceeding supplementary, removal was improper. Remand also is required by other provisions of the federal removal statutes, discussed below.

B. St. Paul has not establish that diversity jurisdiction existed at time of removal

When St. Paul removed this proceeding supplementary on July 12, 2017, asserting that this Court had original jurisdiction under 28 U.S.C. § 1332, Defendant IAG remained in the litigation, as final judgment as to IAG was not entered until August 21, 2017.[4] Exercise of this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 requires that there be complete diversity of the parties, i.e., all plaintiffs must be diverse from all defendants, at the time of removal. Owen Equip. and Recreation Co. v. Kroger, 437 U.S. 365 (1978). As such, there was no subject matter jurisdiction at the time of removal and remand is required.[5]   Similarly, removal violated the forum-

---

[4]Defendant Dames had been dismissed from the case in October 2010, when all claims against him in the Third Amended Complaint were dismissed with prejudice.

[5]If entry of the Final Judgment against IAG in August 2017 effectively eliminated IAG from this proceeding, even though Plaintiff's judgment against IAG remains unsatisfied, St. Paul could argue that the jurisdictional defect has been cured. See, e.g., Caterpillar Inc. v. Lewis, 519 U.S. 61, 64 (1996) (declining to vacate judgment despite lack of diversity jurisdiction at time of removal, where such defect was cured prior to entry of judgment after jury trial in federal court). The Court need not address this issue as the conditions present in Caterpillar, where considerations of finality and efficiency were "overwhelming" after the case already had been tried to a jury in federal court, are lacking here, and there are plentiful other bases for ordering remand.

defendant rule of 28 U.S.C. § 1441(b)(2), which provides that a civil action removable solely on the basis of diversity jurisdiction may not be removed if any of the parties in interest is a citizen of the state in which the action is brought. In <u>Scheele v. Fortney</u>, No. 14-81279-CV, 2014 WL 12478006 (S.D. Fla. Nov. 21, 2014), the court remanded a case for lack of diversity jurisdiction which had been removed by the insurer of a Florida tortfeasor. The case was removed after the insured defaulted, but prior to entry of judgment. Because the interests of the insured defendant remained adverse to the plaintiff's interests, the court held that those parties could not be aligned to establish diversity jurisdiction over the action.[6]

The significance of IAG's citizenship highlights the flaw in St. Paul's attempt to frame this proceeding supplementary as a civil action independent from the tort litigation in state court. If St. Paul is correct that this proceeding is a new civil action (effectively a direct action against the insurer) then removal based on diversity was improper. When an action is filed directly against a liability insurer, 28 U.S.C. § 1332(c)(1) provides that if the insured is not joined as a party-defendant, "such insurer shall be deemed a citizen of ... every State ... of which the insured is a citizen." IAG, the insured, was a citizen of Florida, and therefore St. Paul is deemed a citizen of Florida in this context; consequently, there is no federal subject matter jurisdiction. As explained by the Eleventh Circuit, this jurisdictional statute "was enacted by Congress in order to eliminate the basis for diversity jurisdiction in states that allow an injured third-party claimant to sue an insurance company for payment of a claim without joining the company's insured as a party, where the insured would be a nondiverse party, even though the party insurance company would otherwise be diverse." <u>Fortson v. St. Paul Fire and Marine Ins Co.</u>, 751 F.2d 1157, 1159 (11th Cir. 1985).

_____

[6]The court in <u>Scheele</u> distinguished the holdings of <u>City of Vestavia Hills v. Gen. Fidelity Ins. Co.</u>, 676 F.3d 1310, 1313 (11th Cir. 2012), and <u>Wheeler's Moving & Storage, Inc. v. Market Ins. Co.</u>, No. 11-80272-CV, 2011 WL 3419633 (S.D. Fla. Aug. 4, 2011), which found a basis for diversity jurisdiction in cases timely removed by insurers. Those two cases involved claims by an injured party (<u>Vestavia Hills</u>) and an insured tortfeasor (<u>Wheeler's</u>) whose interests in newly filed actions were aligned as adverse to the insurers, as judgments already had been obtained against the insureds.

Moreover, since this proceeding supplementary is not an independent civil action, St. Paul failed to comply with the procedural requirements of the removal statutes. According to 28 U.S.C.§ 1446(b)(3), a notice of removal must be filed within 30 days after receipt of a pleading "or other paper from which it may first be ascertained that the case is one which is or has become removable." The removal statute forbids § 1446(b)(3) removals when the basis for removal is diversity jurisdiction, and the removal is sought "more than 1 year after commencement of *the action*, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C.§ 1446(c) (emphasis added).[7] A district court recently applied this provision and remanded a case which had been removed by an insurer promptly after the injured party's tort litigation was concluded and a bad faith claim against the insurer was ripe (the insurer had denied coverage at the outset of the tort litigation), because "the action," *i.e.*, the tort litigation, had been filed more than one year prior to removal. Hawkinson v. State Farm Mut. Auto. Ins. Co., No. 3:18-CV-461-J-32MCR, 2018 WL 3526677 (M.D. Fla. July 23, 2018). In addition, as noted above, IAG was a Defendant in this proceeding at the time of removal; thus, by failing to establish that IAG consented to the removal, St. Paul violated 28 U.S.C. § 1446(b)(2)(A).

---

[7]In Jackson-Platts, the court indicated that proceedings supplementary against a third party to whom the judgment debtor had fraudulently transferred assets were sufficiently distinct from the underlying proceeding to be considered a "civil action," such that a newly added diverse defendant, facing claims that were completely remote from, and "wholly unconcerned with" the claims in the underlying state action, could remove the case without regard to the date on which the underlying action was filed, *i.e.*, the one year limitation of § 1446(c) applied only as to the date the proceedings supplementary were instituted against that new defendant. Jackson-Platts, 727 F.3d at 1135. There are no such allegations of fraudulent transfer in the present case, nor any other basis for finding that these proceedings supplementary should be construed as an independent action. Indeed, in Nat'l Marine Svcs, Inc. v. Straub, 776 F.3d 783 (11th Cir. 2015), the Eleventh Circuit cautioned that the holding in Jackson-Platts did not establish that "any" supplementary proceeding under Fla. Stat. § 56.29 is a "new action." The decision in Straub found that a federal judgment creditor's proceeding against the owner of a judgment debtor based on the owner's fraudulent transfers of assets was not a "new lawsuit" and instead was a supplementary proceeding that remained with the federal court where the underlying judgment was obtained, pursuant to the court's ancillary jurisdiction.

"Because removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly," <u>Univ. of S. Alabama v. Am. Tobacco Co.</u>, 168 F.3d 405, 411 (11th Cir. 1999), and "uncertainties are resolved in favor of remand," <u>Burns v. Windsor Ins. Co.</u>, 31 F.3d 1092, 1095 (11th Cir. 1994). There are no uncertainties here. St. Paul, as the removing party, bears the burden of proof regarding the existence of federal subject matter jurisdiction over this proceeding, <u>Purchasing Power, LLC v. Bluestem Brands, Inc.</u>, 851 F.3d 1218, 1225 (11th Cir. 2017), and it has failed to carry its burden. The pertinent facts for this proceeding supplementary are inextricably intertwined with the tort litigation in this case and, as such, these proceedings are supplementary to Plaintiff's underlying action filed eleven years earlier, as discussed above. Because the federal court lacks subject matter jurisdiction over this proceeding supplementary, remand is required.

These jurisdictional prerequisites are unyielding, and "once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." <u>Univ. of S. Alabama</u>, 168 F.3d at 410. The parties' failure to address the jurisdictional issues is of no import, as subject matter jurisdiction "can never be waived or conferred by the consent of the parties." <u>Latin Am. Property & Cas. Ins. Co. v. Hi-Lift Marina, Inc.</u>, 887 F.2d 1477 (11th Cir. 1989), citing <u>Ins. Corp of Ireland v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702 (1982).

Notwithstanding the above conclusions, the undersigned has provided her recommendations, below, as to the other issues in this case in the event that the district court determines that there is a basis for exercise of subject matter jurisdiction.

## C. Other threshold issues

When Plaintiff sought institution of these proceedings supplementary in May 2017, the state court granted the request even though it had not yet entered a Final Judgment. Similarly, when the question was presented in this court, the proceedings supplementary were authorized on

August 9, 2017, prior to entry of the Final Judgment by the state court on August 21, 2017. St. Paul has not raised the delayed entry of the judgment as a basis for discontinuing these proceedings at this time. As there is no indication that the entry of the Final Judgment was delayed for any reason other than an oversight by the state court, this Court finds no basis to require Plaintiff to re-file her request for proceedings supplementary at this time, as Plaintiff clearly is entitled to such proceedings under Fla. Stat.§ 56.29, and has been since at least the end of August 2017.

The Court also observes that St. Paul's Motion for Summary Judgment properly does not rely on the Default Final Judgment it obtained in the declaratory action, Case No. 17-61445, as such judgment does not control the outcome of these proceedings. As noted above, the judgment was entered without St. Paul advising the court of the decision by Judge Dimitrouleas authorizing these proceedings supplementary, which involve the identical issue of whether there is insurance coverage for the claim filed by Ms. Walton. In addition, in the order of Judge Dimitrouleas denying St. Paul's motion to dismiss, he noted that "St Paul states that it will move to consolidate its Declaratory Judgment action with this proceeding 'should the court permit the latter to proceed in federal court.'" (ECF No. 22, at n1) St. Paul filed no motion to consolidate after denial of its motion to dismiss; instead, the next motion filed by St. Paul in the declaratory action was its motion for entry of default as to IAG. (Case No. 17-61445, ECF No. 17) The Default Final Judgment in Case No. 17-61445 is subject to being vacated on those grounds. See, e.g., Rule 60(b), Fed. R. Civ. P. (authorizing relief from final judgments obtained based on mistake, fraud, or "any other reason that justifies relief").[8]

---

[8]According to then-District Judge Robin Rosenbaum, when an insurer files a declaratory action against its insured and the person harmed by its insured, and default is entered against the insured but not the harmed party, "it would be improper to enter [default] judgment in favor of [the insurer declaring the scope of its duty] ... as it pertains to [the tort suit between the defaulted defendant and the other defendant]." Zurich Am. Ins. Co. v. Ednic Trading Corp., No. 13-62229-CV, 2014 WL 869216 (S.D. Fla. March 5, 2014). See, also, Century Surety Co. v. Broward Collision, Inc., No. 13-62096-CV, 2014 WL 11761588 (S.D. Fla. June 4, 2014) (improper to enter default judgment in favor of insurer as to its duty to its insured who has defaulted, when other party to declaratory action opposes insurer's efforts and there is risk of inconsistent judgment as to duties under the policy).

### III. UNDISPUTED FACTS

The following facts are drawn from the Court's review of the parties' statements of fact and additional materials in the record, pursuant to Rule 56(c)(3), Fed. R. Civ. P. The Court also has reviewed the filings before the state court, to the extent that they were available, as permitted under Rule 201(b)(2), Fed. R. Evid.

#### A. The tort litigation

After presenting her claim to the EEOC, Plaintiff filed her original complaint in December 2007, alleging that she was harmed by actions of her employer, IAG, and her supervisor, Mr. Dames. (ECF No. 38-2) Plaintiff alleged claims for sexual harassment, assault and battery, and intentional infliction of emotional distress, relating to Mr. Dames's attempt to force Ms. Walton to have oral sex in August 2007, and other offensive conduct.

IAG retained the law firm of Holland & Knight at some time in 2008 to defend IAG in Plaintiff's case. (ECF No. 38, at ¶ 10, ECF No. 37, at p. 11 of 38) Holland & Knight and one of its attorneys, Kelly-Ann Cartwright, continued to represent IAG until the law firm requested to withdraw from representing IAG, which was granted by the court on July 10, 2012. (ECF Nos. 38-11, 38-13) At that time the court ordered IAG "to provide any and all insurance policies in effect at the time of Plaintiff's alleged incident within 15 days." (ECF No. 38-13) Notice of the state court's order was provided to Michael Romm, general counsel for IAG. (ECF No. 38, at ¶ 14)

Early in the litigation, on May 14, 2008, Plaintiff's counsel requested from IAG its insurance information. (ECF No. 38-5) Ms. Walton's counsel again requested insurance information in November 2008. (ECF No. 38, at ¶ 18) On November 17, 2008, defense counsel Ms. Cartwright wrote to her client IAG and asked: "Do you have a policy that would cover the intentional or negligent torts alleged in the complaint?" Michael Romm responded: "My CFO ... and I tried to place

a call to our agent this afternoon but he was unavailable. We will try again tomorrow and let you know." (ECF No. 38-7)[9]

On October 7, 2010, the state court granted IAG's motion to dismiss, with prejudice, Plaintiff's intentional tort claims and her state statutory claim for sexual harassment. (ECF No. 38-8) The sole remaining claim in her Third Amended Complaint was as to Defendant IAG for negligent hiring, retention, training and supervision of its employees.

On November 4, 2010, Ms. Cartwright, on behalf of IAG, objected to Plaintiff's request for production of insurance policies of IAG "in effect during the years 2005-2007," stating: "IAG objects to this request on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Every insurance policy which may have been in effect during 2005-2007 is not relevant to Plaintiff's narrow allegations of negligent hiring, retention, training and supervision." (ECF No. 38-9) No policies were produced at that time.

Eighteen months later, after Holland & Knight had requested to withdraw from representing IAG, Mr. Romm wrote to Holland & Knight attorneys on July 9, 2012: "As for the insurance question, we have no information regarding insurance and you are directed to simply 'NOT

---

[9]The November 2008 email communication, between IAG's general counsel and its attorney Ms. Cartwright, was provided as an exhibit to St. Paul's Statement of (undisputed) Material Facts in support of its motion for summary judgment. While St. Paul later argued that the communication was inadmissible as hearsay, the court "may consider hearsay in ruling on a summary judgment motion where that statement could be 'reduced to admissible evidence at trial.'" Hetherington v. Wal-Mart, Inc., 511 Fed. App'x 909, 911 (11th Cir. 2013) citing Macuba v. Deboer, 193 F.3d 1316 (11th Cir. 1999). Further, "a court may consider unauthenticated evidence on a motion for summary judgment if the evidence is unchallenged or where it finds that those records could be reduced to admissible evidence at trial." Martin v. Allied Interstate, LLC, 192 F. Supp. 3d 1296 (S.D. Fla. 2016) (internal quotations omitted). In this case, Plaintiff does not challenge this exhibit offered by St. Paul, and the deposition testimony of one party to the subject email communication, Ms. Cartwright, confirms that her law firm produced the record of that communication, and that her email address appeared in that record. (ECF No. 37, at pp. 11-12 of 38)

RESPOND' to any requests for insurance information." (ECF No. 38-12) This message was produced by Holland & Knight in this case, as testified to by Ms. Cartwright. (ECF No. 37, at p. 12 of 38)

Despite having withdrawn from representing IAG approximately two months earlier, Ms. Cartwright sent a letter to counsel for Plaintiff on August 23, 2012, stating "[e]nclosed please find insurance documents received from St. Paul Travelers Insurance Co." (ECF No. 38-14) At her deposition in this case, Ms. Cartwright stated that she did not know if notice was sent to St. Paul regarding Plaintiff's claim and she did "not have an independent recollection of having any discussion with anyone at St. Paul Travelers Insurance Company." (ECF No. 37, at pp. 23-25 of 38)

A jury trial was scheduled for September 2012, according to an order entered December 1, 2011. On March 1, 2012, Mr. Romm filed Articles of Dissolution of IAG, effective December 31, 2011, with the Florida Division of Corporations, on behalf of Michael Weinsoff, President of IAG.[10] (ECF No. 38-10) One year later, on March 5, 2013, the state court entered an order striking IAG's answer and affirmative defenses. (ECF No. 38-16)  Mr. Romm was provided notice of that Order. Id. According to the record before the state court, trial was rescheduled for February 2013, and then rescheduled for February 2015. The parties were scheduled for mediation "by agreement of the parties" on February 11, 2015, and Mr. Romm was provided with an Order Setting Case Management on December 15, 2015.

The case was tried to a jury on June 7, 2016, with testimony from Plaintiff and another witness, resulting in a verdict in favor of Plaintiff. (ECF No. 25-2)[11] Final judgment was entered on August 21, 2017. (ECF No. 31-1)

On May 8, 2017, after the verdict but prior to entry of final judgment, Plaintiff filed a Motion for Proceedings Supplementary and to Implead Non-Party St. Paul, pursuant to Fla. Stat.§

_____

[10]According to St. Paul, Mr. Weinsoff died in 2014 (no death certificate has been produced). (ECF No. 38, at ¶ 18)

[11]The jury submitted questions, and responses were provided, about Plaintiff's annual salary ($33,000), and how much she had spent on medical expenses ($115,000).

56.29, based on a "liability insurance contract" with IAG which "provides liability coverage for [Plaintiff's] injury." (Declaration of Coleman W. Watson, current counsel for Plaintiff, ECF No. 1-1) On May 23, 2017, the state court granted Plaintiff's request and issued a Notice to Appear to St. Paul, which was served on St. Paul on June 22, 2017. (ECF Nos. 1-2, 1-3, ECF No. 1, at ¶ 4) St. Paul removed the case to this court three weeks later.

### B. The insurance policy

IAG obtained from St. Paul a Technology Commercial General Liability Protection policy, covering the period September 28, 2006, to September 28, 2007, which provided limits of $1,000,000 for general liability per occurrence and an aggregate limit of $2,000,000. (ECF No. 1, at ¶ 13, ECF No. 25-4) IAG also obtained from St. Paul a Technology Umbrella Excess Liability Protection policy. (ECF No. 25-4, at p. 107 of 210) For purposes of this Report, the Court refers to a single "policy" of insurance, as the pertinent terms of each policy are materially the same.

The policy provides that employees of the insured corporation, IAG, are "protected persons" only for "work done within the scope of their employment" or their "performance of duties related to the conduct of [the insured corporation's] business." (ECF No. 25-4, at p. 67 of 210) Ms. Walton and Mr. Dames were employed by IAG in August 2007, and Mr. Dames was Ms. Walton's supervisor. (Defendant's Statement of Material Facts, ECF No. 38, at ¶¶ 4-5) It is undisputed that the assault on Ms. Walton occurred while Mr. Dames was "acting in the scope of his employment and in fulfillment of his duties," and that Mr. Dames had "called Ms. Walton into his office under the auspice of discussing her work performance." (ECF No. 38, at ¶¶ 6-7)

The policy's Exclusions are listed beginning at page 12 of the policy (ECF No. 25-4, p. 72 of 210). The "Employers liability" section states:

> We won't cover bodily injury to an employee of the protected person arising out of and in the course of his or her:
>   * employment by the protected person; or
>   * performance of duties related to the conduct of the protected person's business.

The "Employers liability" exclusion relies on the definition of "employee" found in the "Employees and volunteer workers" section of the policy which, in turn, provides that "no employee ... is a protected person for bodily injury to ... any fellow employee." (ECF No. 38, at ¶¶ 6-7) However, that section of the policy also provides that St. Paul will not apply the exclusions "in this Employees and volunteer workers section to bodily injury to ... any fellow employee that results from work by [the insured's] employees who hold supervisory positions ...." Id.

The policy also excludes from coverage any "personal injury to any protected person's employee ... that results from any employment-related practices." (ECF No. 25-4, at p. 77 of 210)

The policy's notice provisions state, in pertinent part:

> If your policy provides liability protection and there's an [offense or omission] that may result in damages or other amounts which may be covered under that protection, you ... must do all of the following in connection with that [offense or omission]: As soon as possible after having knowledge of the [offense or omission], tell us or one of our authorized representatives what happened.... As soon as possible after receiving them, mail, deliver, or otherwise give to us a copy of ... all legal documents relating to any suit brought ... against you or any other person ... protected under your policy.

(ECF No. 25-4, at p. 26 of 210)

The interests of persons insured under the policy are treated separately. "We'll apply this agreement separately to each protected person." ECF No. 25-4, at p. 70 of 210).

## IV. ANALYSIS

### A. Legal Standards

1. Summary judgment in proceedings supplementary

Summary judgment is appropriate in proceedings supplementary, as in other contexts, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. A fact is material if it might affect

the outcome of the case, and a genuine dispute is such that a reasonable jury could return a verdict for the non-movant. Hairston v. Gainesville Sun Pub. Co, 9 F.3d 913, 919 (11th Cir. 1993).

 The movant bears the initial burden to demonstrate what record evidence shows an absence of a genuine issue of material fact. Id., at 918. When reviewing the motion to determine whether the movant has met this burden, the court must view all of the evidence, and factual inferences drawn therefrom, in the light most favorable to the non-moving party. Id.. If the movant meets its burden, then the burden of production shifts to the nonmovant to establish that there exist genuine disputes of material fact. Id. Evidence of the non-movant is to be believed, and all justifiable inferences drawn in her favor. Id., at 919. "If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

 To determine what facts are material to these parties' dispute, the Court reviews the elements required to obtain recovery through proceedings supplementary, and what must be shown to establish a defense thereto. According to Rule 69(a), Fed. R. Civ. P., proceedings supplementary "must accord with the procedure of the state where the court is located." As described above in the section on jurisdiction, a judgment creditor with an unsatisfied judgment is entitled to institute proceedings supplementary to execution pursuant to Fla. Stat.§ 56.29. The judgment creditor need only file a motion and affidavit identifying the unsatisfied judgment and attesting to the validity of the execution in order to be entitled to proceedings supplementary to execution. Fla. Stat.§ 56.29(1). The motion, or a supplemental affidavit, must describe any property or obligation owed to the judgment debtor which may be applied toward satisfaction of the judgment and which is in the control of a third party. Fla. Stat.§ 56.29(2).

18

Proceedings supplementary provide a judgment creditor with a method of investigating assets of the judgment debtor that might be used to satisfy a judgment, and such proceedings allow for expeditious discovery. Regent Bank v. Woodcox, 636 So.2d 885, 886 (Fla. 4th DCA 1994). After the third party with control over "property or obligation owed to the judgment debtor" has had an opportunity to respond to the Notice to Appear, the Court may order nonexempt property or obligations to be levied upon and applied toward the satisfaction of the judgment debt. Fla. Stat.§ 56.29(6). The respondent shall file an affidavit "stating why the property, debt, or other obligation should not be applied to satisfy the judgment." Fla. Stat. § 56.29(2). The responding affidavit "must raise any fact or defense opposing application of the property described ... to satisfy the judgment, including legal defenses, such as lack of personal jurisdiction." Id.

Florida law authorizes a court to enter "any orders required" to carry out the purpose of the statute to subject property of a defendant to execution. Biel Reo, LLC v. Barefoot Cottages Development Co., LLC, 156 So.3d 506, 508-09 (Fla. 1st DCA 2014) (citations omitted). However, in proceedings supplementary, the court "issues no judgment against the third party ....[because] the supplemental proceeding [merely] determines whether the third party possesses property that belongs to the judgment debtor." Katzman v. Comprehensive Care Corp., No. 8:17-CV-2107-T-23AEP, 2017 WL 4944802 (M.D. Fla. Nov. 1, 2017).[12]

Proceedings supplementary are "equitable in nature," designed to give a judgment creditor the most complete relief possible to satisfy its judgment. As noted above, although an impleaded defendant has the opportunity to respond to the Notice to Appear and state why the property it controls of the judgment debtor should not be applied to satisfy the

---

[12]Costs for proceedings supplementary shall be taxed against the judgment debtor and reasonable attorney fees may be taxed against the judgment debtor. Fla. Stat. 56.29(8).

outstanding judgment, the statute is to be given "a liberal construction so as to afford to the judgment creditor the most complete relief possible." General Guaranty Ins. Co. of Fla. v. DaCosta, 190 So.2d 211 (Fla. 3d DCA 1966).

2. St. Paul's "Legal Defenses" to this proceeding supplementary

St. Paul's response to this proceeding raises arguments regarding process and fairness. See, e.g., St. Paul's "Legal Defenses to Supplementary Proceedings." (ECF No. 24-1) St. Paul argues that this proceeding supplementary violates the spirit of Florida's nonjoinder statute, Fla. Stat.§ 627.4136, which provides that no cause of action accrues against an insurer by a claimant (or any third party) until the claimant obtains a settlement or a verdict against an insured, and also prohibits joining an insurer as a party defendant if the insurer has denied coverage. Fla. Stat. § 627.4136(4). St. Paul also points to a lack of reported decisions interpreting insurance contracts in the context of proceedings under Fla. Stat.§ 56.29, as support for its position. Both of St. Paul's arguments are unavailing.

First, there is no prohibition on impleading a judgment debtor's liability insurer under Fla. Stat. § 56.29, as recognized either directly or implicitly in several reported decisions. See General Guaranty Ins. Co. of Fla. v. DaCosta, 190 So.2d 211 (Fla. 3d DCA 1966) (affirming decision of then-state court Judge Joe Eaton finding that proceeds due from a liability insurance policy are subject to proceedings supplementary to execution on a judgment), Nova Cas. Co. v. Wilson Developers, LLC, 212 So.3d 477, 478-79 (Fla. 2d DCA 2017) (insurer of judgment debtor impleaded in proceedings supplementary brought by judgment creditor should not have been added to final judgment as a party); Bodywell Nutrition, LLC v. Fortress Systems, LLC, 846 F. Supp. 2d 1317, 1327 (S.D. Fla. 2012) (dismissing proceedings supplementary because insurer's declaratory action already was

20

pending).[13] St. Paul attempts to distinguish General Guaranty, which was relied upon by the state court in granting Plaintiff's request for proceedings supplementary, by arguing that the case was decided prior to the enactment of Florida's nonjoinder statute. According to St. Paul, because the nonjoinder statute prohibits joining an insurer as a party defendant until a judgment is rendered against the insured, and the statute also prohibits joining an insurer if the insurer denied coverage, a proceeding supplementary to implead St. Paul "flies in the face of the intent clearly underlying the [nonjoinder] statute." (ECF No. 24-1, at 18) St. Paul's argument is misplaced, as "[t]he purpose of the nonjoinder statute is straightforward: 'to ensure that the availability of insurance has no influence on the jury's determination of ... damages.'" Geico General Ins. Co. v. Lepine, 173 So.3d 1142 (Fla. 2d DCA 2015). There is no suggestion, nor could there be under the undisputed facts, that Plaintiff violated either the letter or the spirit of the nonjoinder statute.

The small number of reported decisions involving insurance coverage disputes in proceedings supplementary is unsurprising in light of Florida's insurance disclosure law, which apparently was ignored by IAG and its counsel in the tort litigation, despite Plaintiff's repeated requests for such information. When the law is followed, an injured person requests insurance information from the tortfeasor, who is required to provide such information pursuant to Fla. Stat. § 627.4137(1), which imposes a duty on an insured or its agent to

---

[13]St. Paul quotes the observation of the court in Bodywell Nutrition, LLC v. Fortress Systems, LLC, 846 F. Supp. 2d 1317, 1327 (S.D. Fla. 2012), that there are a "paucity of cases considering coverage in proceedings supplementary." In Bodywell, the insurer first filed a declaratory action seeking a determination of whether the underlying claim was subject to certain exclusions in the insurance policy, and then subsequently was named a defendant in proceedings supplementary. The two cases were before the same court, and the parties were identical. The court noted that where the first-filed rule applied, the insurer correctly argued that to permit insurance coverage determinations to be addressed first in proceedings supplementary, rather than in the first-filed declaratory action, would "transform coverage litigation in Florida." Bodywell, 846 F. Supp. 2d at 1327. The decision stands for the uncontroversial proposition that first-filed cases have priority, and does not stand for the principle that insurers cannot be impleaded, nor that liability insurance policies cannot be a source of recovery under proceedings supplementary, as the Court made no such findings.

timely disclose the name and coverage of each known insurer, and also requires liability insurers to respond to written requests for coverage information.[14] Having received the insurer's information from the tortfeasor, the injured person is not prohibited from directly contacting the insurer to negotiate settlement of the claim, but is not required to do so. The injured person can proceed in court against the insured and, after a verdict has been obtained against the insured, join the insurer as a defendant. Under such framework, it is unsurprising that few reported decisions exist where claimants and insurers are disputing insurance coverage in proceedings supplementary. The unusual posture of this case, where St. Paul claims to have had no notice of Plaintiff's bodily injury claim until this proceeding supplementary, and elected to remove this proceeding rather than remaining in state court, then filed a declaratory action seeking a determination as to coverage (as it was entitled to do) without disclosing the pending proceeding, reveals that St. Paul has not suffered a lack of process in this court.

   To the extent that St. Paul argues that Plaintiff was required to make contact with the insurer directly, an obligation for which St. Paul cites no authority, the Court rejects that argument. Plaintiff's only possible benefit of contacting the insurer after she obtained information about IAG's insurance policy in mid-2012 would have been to try to settle her claim directly with the insurer. However, IAG had been dissolved as of that time and, in light of the insurer's subsequent decision to deny coverage based on "the contents of available pleadings from the underlying tort action" (which were complete as of mid-2012) such efforts by Plaintiff clearly would have been futile. Even if she had succeeded in making contact, she could not rely on any representations of the insurer until she obtained a verdict against IAG. See, e.g., Geico General Ins. Co. v. Lepine, 173 So.3d 1142 (Fla. 2d DCA

---

[14]The statute imposes no duty on a claimant to independently locate or contact the relevant insurer.

2015) (estate of victim of accident caused by insured could not sue insurer for insurer's breach of its pre-suit agreement to settle underlying case directly with estate, as estate lacked a "settlement or verdict" against the insured as a required precursor to direct action against insurer under Fla. Stat.§ 627.4136).

Finally, in seeking dismissal of this case, St. Paul argued that "Plaintiff's strategy" has been to avoid allowing St. Paul to have the "procedural advantages" of determining coverage through a declaratory action in federal court and being able to utilize the federal rules of civil procedure "to even the playing field, considering the significant advantage Plaintiff has in these proceedings considering its significant participating [sic] in the underlying litigation." (ECF No. 10, at p. 17 of 21) St. Paul's argument failed to recognize that if it had remained in state court, the Florida Rules of Civil Procedure would apply to this proceeding supplementary. Rule 1.010, Fla. R. Civ. P. ("[t]hese rules apply to ... all special statutory proceedings"); see, also, Patterson v. Venne, 594 So.2d 331 (Fla. 3d DCA 1992).

In summary, the Court finds that St. Paul has not been denied appropriate procedural protections, nor has it established that it is entitled to relief from appearing in these proceedings.

3. Interpretation of insurance contracts

Interpretation of insurance contracts is a question of law. Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1219 (11th Cir. 2015); Coleman v. Fla. Ins. Guar. Ass'n, 517 So.2d 686 (Fla. 1988). The parties agree that Florida law governs the interpretation of the policy at issue. Under Florida law, insurance contracts are construed according to their "plain meaning," Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co., 913 So.2d 528, 532 (Fla. 2005), as understood by the "average person," Berkshire Life Ins. Co. v. Adelberg, 698 So. 2d 828, 830 (Fla. 1997).

23

In construing insurance contracts, courts should read the contract, or policy, as a whole, "endeavoring to give every provision its full meaning and operative effect." Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000). When the language of the insurance contract is plain and unambiguous, *i.e.*, the terms are susceptible to only one reasonable interpretation, the contract will be enforced as written.  Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co., 913 So.2d 528, 532 (Fla. 2005). If a term of the contract is ambiguous, *e.g.*, is susceptible to two or more meanings, that ambiguity is "interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." Prudential Prop. & Cas. Ins. Co. v. Swindal, 622 So.2d 467 (Fla. 1993). "[E]xclusionary clauses are construed even more strictly against the insurer than coverage clauses." Chandler v. Geico Indem. Co., 78 So.3d 1293, 1300 (Fla. 2011).

If the relevant policy language "is susceptible to more than one reasonable interpretation, one providing coverage and one limiting coverage, the policy is considered ambiguous." Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000). If ambiguities are found, they are resolved in favor of the insured by "adopting the reasonable interpretation of the policy's language that provides coverage." State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So.3d 566, 569 (Fla. 2011).

Simply stated, because insurance contracts are contracts of adhesion, coverage provisions are read broadly to support a finding of coverage, and exclusionary provisions are read narrowly to support a finding of coverage. Despite these principles of construction favoring the insured, "courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Intervest Const. of Jax, Inc. v. General Fidelity Ins. Co., 133 So.3d 494, 497 (Fla. 2014) (internal quotations and citations omitted).

24

St. Paul seeks summary judgment in this proceeding supplementary and, thus, has the initial burden of demonstrating the absence of triable fact as to whether it has property "owed to the judgment debtor." Fla. Stat. § 56.29(6). The parties agree that the policy at issue insured IAG for general liability and contractually bound St. Paul to defend and to indemnify IAG for covered claims. St. Paul argues that it owed no duty to defend, nor indemnify, its insured because it received untimely notice of Plaintiff's claim and also because Plaintiff's claim was not covered under the policy, pursuant to the "Employers liability" exclusion. Plaintiff opposes St. Paul's motion for summary judgment and asserts that there is a question of fact as to whether St. Paul had timely notice or, even if it notice was untimely, that Plaintiff has overcome any presumption that St. Paul was prejudiced by untimely notice. Plaintiff's memorandum did not address the argument relating to the "Employer liability" exclusion.

To determine whether an insurer has a duty to defend, Florida law requires a court to review the underlying complaint and the insurance policy, an approach known as the "eight corners rule." Composite Structures, Inc. v. Cont'l Ins. Co., 560 Fed. App'x 861, 865-65 (11th Cir. 2014), referring to the four corners of the complaint and the four corners of the policy. If the allegations of the complaint leave any doubt regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend." Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So.2d 810, 814 (Fla. 1st DCA 1985).

The duty to indemnify is a narrower duty, and is dependent upon the entry of a final judgment or final resolution of the underlying claims. Generally, a finding that an insurer owes a duty to defend implies that the insurer also owes a duty to indemnify, but courts must look to the policy and also to the facts in the underlying case, and not rely solely on the allegations as pleaded. For the past century, Florida law has provided that "where two

interpretations equally fair may be given, that which gives the greater indemnity will prevail." Elliott v. Belt Auto. Ass'n, 100 So. 797, 798 (1924) (internal quotations omitted).

A breach of the insurance contract by the insured can relieve the insurer of performance of its duties if the breach was material, *e.g.*, if the breach caused prejudice to the insurer. Allstate Floridian Ins. Co. v. Farmer, 104 So.3d 1242, 1250 (Fla. 5th DCA 2012) (affirming verdict in favor of insured, finding that insurer was not prejudiced by insured's failure to substantially comply with the "proof of loss" condition of the policy). The duty to demonstrate a lack of prejudice is the insured's and when conflicting evidence is presented, the question is for the trier of fact to decide. Farmer, 104 So.3d at 1250.

Pertinent here, Florida law recognizes "[t]he failure to give timely notice to an insurer of a claim [as] a 'legal basis for the denial of recovery under the policy.'" Yacht Club on the Intracoastal Condominium Ass'n, Inc. v. Lexington Ins. Co., 599 Fed. App'x 875, 879 (11th Cir. 2015) (quoting Ideal Mut. Ins. Co. v. Waldrep, 400 So. 782 (Fla 2d DCA 1981)). The presumption of prejudice caused by untimely notice is rebuttable, as recently confirmed by the Eleventh Circuit. "We disagree [that an insured can never rebut the presumption of prejudice]. Florida courts have offered various ways by which an insured can rebut the presumption." Yacht Club, 599 Fed. App'x, at 882. For example, an inference that the outcome of a liability suit would not have been different, because an investigation conducted immediately following the event would not have disclosed anything materially different from what was disclosed in the delayed investigation, "is sufficient to dissipate the presumption [that an insurer was prejudiced by untimely notice] so as to make an issue for the trier of fact." Niesz v. Albright, 217 So.2d 606, 608 (Fla. 4th DCA 1969). The issue of whether an insured has overcome the presumption of prejudice caused by late notice is generally reserved for the trier of fact. 1500 Coral Towers Ass'n, Inc. v. Citizens Prop. Ins. Corp., 112 So.3d 541, 544 (Fla. 3d DCA 2013).

**B. Defendant's Motion for Summary Judgment**

St. Paul's Motion for Summary Judgment argues that it does not owe an obligation to the judgment debtor IAG, and consequently is not required to pay Plaintiff's judgment in this proceeding supplementary, because St. Paul's insurance policy excluded coverage for Plaintiff's claim and, even if coverage existed, the lack of timely notice by IAG presumptively prejudiced St. Paul and such prejudice has not been rebutted by Plaintiff. Plaintiff argues that whether notice was timely cannot be determined from the undisputed facts. Also, the Plaintiff contends that even if notice had been untimely, St. Paul has not been prejudiced.

1. "Employer liability" exclusion as a basis for denial of coverage

St. Paul's policy provides that employees of the insured corporation, IAG, are "protected persons" only for "work done within the scope of their employment" or their "performance of duties related to the conduct of [the insured corporation's] business." (ECF No. 25-4, at p. 67 of 210) It is undisputed that IAG itself is a "protected person" as defined by the insurance policy, and also that Ms. Walton's complaint related to conduct during the time the insurance policy was in effect.

a. Plaintiff's injuries as related to her employment status

According to St. Paul, the policy's "Employers liability" exclusion excludes Ms. Walton's claim for bodily injury. The "Employers liability" exclusion provides that St. Paul "won't cover bodily injury to an employee of the protected person arising out of and in the course of his or her employment" or "performance of duties related to the conduct of the

27

protected person's business."[15] St. Paul asserts that Ms. Walton's injuries were a result of work done arising out of or in the course of her employment because her claim against IAG was for negligent hiring, retention, training, and supervision.

       The allegations of Plaintiff's pleading, analyzed with respect to the terms of the insurance contract, control the determination of whether Ms. Walton's claim is covered. Plaintiff's pleading alleges that Mr. Dames instructed her to "return to his office at the conclusion of her shift" to discuss her work performance. (ECF No. 38-1, at 12) Plaintiff reported to Mr. Dames's office at approximately 4:00 pm, "at the conclusion of her shift, as part of her work responsibility to answer to the Supervisor [Mr.] Dames." (ECF No. 38-1, at ¶¶ 13,16) After breaking free from Mr. Dames, Plaintiff exited the office and left the premises, *i.e.*, she did not continue working. (ECF No. 38-1, at ¶ 20) A review of these allegations demonstrates that Plaintiff's reporting to Mr. Dames's office "at the conclusion of her shift" had more than a mere coincidental connection to her employment. The Supreme Court of Florida has held that the phrase "arising out of" in insurance coverage or exclusion provisions must be read broadly, requiring "some level of causation greater than coincidence," but not equivalent to proximate causation. See, e.g., Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co., 913 So.2d 528, 533 (Fla. 2005) (finding that insurers of firearms manufacturer were not required to defend their insured as to claims brought by municipalities for costs of gun violence, as such claims were excluded from coverage as "arising out of" the insured's product).[16] The Court's analysis does not end here, however.

---

[15]Plaintiff's failure to address the effect of the exclusions does not obviate the need for the Court to do so, as the Court must determine whether Defendant satisfied its burden on summary judgment to demonstrate that record evidence shows an absence of genuine dispute as to material facts.

[16]In Taurus, the court described the causal connection "arising out of" as equivalent to the injury being "incident to," or "growing out of" the operative fact, but noted that a showing that the insured's premises were the location of the injury is insufficient, standing alone, to establish the requisite causal connection. Taurus, 913 So.2d at 534, 539.

b. Mr. Dames is a protected person under the policy, which renders the policy ambiguous

Mr. Dames was a supervisor at IAG, and it is undisputed that the assault on Ms. Walton occurred while Mr. Dames was "acting in the scope of his employment and in fulfillment of his duties," as he had "called Ms. Walton into his office under the auspice of discussing her work performance." (ECF No. 38, at ¶¶ 6-7) Accordingly, Mr. Dames is a protected person according to the policy's definition of that term.

St. Paul argues that Mr. Dames was not a protected person because "[t]he definition of 'protected person' specifically excludes employees for 'bodily injury' to any fellow employee." ECF No. 39, at 10. St. Paul is correct that the policy states that "no employee ... is a protected person for bodily injury to ... any fellow employee." (ECF No. 38, at ¶¶ 6-7) St. Paul's argument fails, however, to account for a provision found in the same section of the policy, defining "protected persons," which specifies that St. Paul will not apply the exclusions "in this Employees and volunteer workers section to bodily injury to ... any fellow employee that results from work by [the insured's] employees who hold supervisory positions ...." Id. Florida law requires that exclusionary clauses be construed even more strictly than coverage clauses, and that a policy generally be construed in favor of the insured and strictly against the insurer. Prudential Prop. & Cas. Ins. Co. v. Swindal, 622 So.2d 467 (Fla. 1993). Because Mr. Dames was a supervisor at IAG, the Court rejects St. Paul's argument that Mr. Dames is not a "protected person" under the policy.

The "Employers liability" exclusion on which St. Paul relies expressly incorporates the explanation of the term "employee" found in the "Employees and volunteer workers section," which includes an exception to the employee-to-employee injury exclusion such that bodily injury to "any fellow employee" that results from a fellow employee who

holds a supervisory position is not excluded from coverage.[17] The only interpretation of the policy that can reconcile the exclusion of some, but not all, employee-versus-employee injuries in the "Employees and volunteer workers" coverage definitions section of the policy with application of the "Employers liability" exclusion, which purports to exclude *all* claims of an employee arising out of the employment (even if such claims resulted from a supervisor's conduct), is to find that claims for injury resulting from a supervisors' work are not excluded from coverage even if they arise out of the injured employee's employment.[18]

None of the cases cited by St. Paul to support application of the "Employer liability" exclusion under Florida law involved claims of injury to an employee caused by the work of one of its employer's supervisory employees.[19] See Scottsdale Ins. Co. v. GFM Operations, Inc., 789 F. Supp. 2d 1278, 1288-89 (S.D. Fla. 2011) (while leaving his employer's premises employee shot during a robbery, which he attempted to prevent, in the interest of his employer), Sinni v. Scottsdale Ins. Co., 676 F. Supp. 2d 1319, 1332-33 (M.D. Fla. 2009) (employee slipped and fell on premises of employer while leaving at end of her workday). Nor does the decision in St. Paul Fire & Marine Ins. Co. v. Seagate Tech., Inc., 570 N.W.2d 503, 506 (Minn. Ct. App. 1997) (assault by one employee on another during

---

[17]"We explain the terms ... employee in the Employees and volunteer workers section." (ECF No. 25-4, at 77 of 210)

[18]As noted above, the Employers liability section relies upon the definitions of the Employees and volunteer workers section in the policy's initial definitions of coverage, which is where the exception for injury caused by a supervisor is found.

[19]St. Paul argues that "[g]eneral liability policies are intended to protect an insured against bodily injury claims by members of the general public, not employees of the insured." (ECF No. 39, at 13) That general statement is of little relevance here, as the terms of the specific insurance contract control, and this contract specifically states that one of its exclusions to coverage will not be applied to claims of bodily injury to "any fellow employee" by a supervisory employee, thus, it reasonably appears that at least some employees can bring a claim against the insured that is covered.

work hours, court rejected argument that assault was result of personal animosity and not caused by employment) assist the court.[20]

The coverage provisions of the policy define protected persons as those employees performing work for the insured. An exclusion to the specific coverage provision, which must be construed more strictly against the insurer, provides that claims of a fellow employee based on harm caused by a supervisor are not excluded. As understood by the "average person," a supervisor *is* a protected person under this policy as to injuries his or her work causes to a fellow employee, which suggests that there must be some type of claim a fellow employee could bring against the insured as to injuries caused by the employee's supervisor's work. St. Paul's interpretation that no employee's claims are covered renders meaningless the portion of the policy that provides that an employee's claim for injury caused by a supervisor is not excluded from coverage and, thus, is not preferred under Florida law. "[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." Premier Ins. Co. v. Adams, 632 So.2d 1054, 1057 (Fla. 5th DCA 1994).

Moreover, the policy includes a severability of insureds provision, and states that the policy will be applied "separately to each protected person." Mr. Dames is a protected person under the policy, sued by Plaintiff, and, thus, the Employers liability exclusion can be interpreted to not apply to Plaintiff's claim, as she was not "an employee of the protected person."[21] See, e.g., Premier Ins. Co. v. Adams, 632 So.2d 1054, 1057 (Fla. 5th

---

[20]The Court in Seagate Tech noted that under Minnesota law, the phrase "arising out of" does not mean proximate cause. Id. at 507. That ruling comports with Florida decisions interpreting the phrase "arising out of" in policy coverage provisions as requiring "some level of causation greater than coincidence." See, e.g., Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co., 913 So.2d 528, 533-534 (Fla. 2005).

[21]Each version of Plaintiff's pleading included claims against Mr. Dames, which would require St. Paul to provide a defense under the policy. Although all claims involving Mr. Dames were dismissed with prejudice in 2010, the verdict and final judgment were entered specifically

DCA 1994) (insurer had duty to defend parents sued for negligent supervision of son who sexually abused a minor, as policy's exclusion for "intentional acts" committed by an insured applied only to the son and not the claim against the parents for negligence); <u>Evanston Ins. Co. v. Design Build Interamerican, Inc.</u>, 569 Fed. App'x. 739 (11th Cir. 2014) (separation of insureds provision, applied to an employer liability exclusion, precluded application of the exclusion to claim of employee suing a co-employee rather than his employer).[22] Therefore, at a minimum, St. Paul had a duty to defend the case as to Mr. Dames.

c. The employment-related practices exclusion is inapplicable

The policy's "Employment-related practices" exclusion explicitly exempts from coverage personal injury claims related to employment-related practices defined to include an "employment-related act, omission, policy, or practice, such as ... harassment." The exclusion is silent as to claims for bodily injury. Ms. Walton's claim against IAG for negligent hiring, retention, training and supervision of its employees can be interpreted reasonably as meeting the policy's definition of an employment-related practice and, since her claim is for bodily injury it is not excluded.[23]

In summary, viewing the policy as a whole, the operation of the policy's exclusions, along with the definitions of protected persons and the exception to the exclusion of employees as "protected persons" as to claims of bodily injury from fellow employees, and

against both IAG and Mr. Dames.

[22]In <u>Design Build</u>, the court noted that Florida courts do not treat differently the use of "the insured" (here, "the protected person") compared to "any insured" when used in an exclusionary provision of a policy with a severability of interests provision, as the terms are used severally, as opposed to collectively or jointly." <u>Design Build.</u> 569 Fed. App'x. at 744 n.7.

[23]St. Paul has not argued that the "Employment-related practices" exclusion applies to Ms. Walton's claim for bodily injury.

the lack of exclusion for bodily injury claims related to employment practices, leads to inconsistent interpretations and, as such, the policy is ambiguous.[24] In <u>Liebel v. Nationwide Ins. Co. of Florida</u>, 22 So.3d 111, 117 (Fla. 4th DCA 2009), the court found that where a reasonable person could interpret an insurance policy as providing two or more reasonable interpretations of "intersecting provisions" of the policy, the policy was ambiguous and should be read to favor the insured. Accordingly, the Court recommends adopting "the reasonable interpretation of the policy's language that provides coverage." <u>State Farm Mut. Auto. Ins. Co. v. Menendez</u>, 70 So.3d 566, 569 (Fla. 2011). Further, because indemnity depends on facts and evidence adduced in the proceedings below, rather than the allegations of Plaintiff's pleading, <u>Sunshine Birds and Supplies, Inc. v. U.S. Fidelity and Guar. Co.</u>, 696 So.2d 907, the entry of judgment against IAG on the basis of a claim for which the Court finds coverage existed compels the conclusion that St. Paul had a duty to indemnify IAG under the policy.

2. <u>Untimely notice of Plaintiff's claim as a basis for St. Paul's denial of coverage</u>

Under Florida law, the failure to give timely notice to an insurer of a claim entitles an insurer to a presumption that it was prejudiced, which can be rebutted by the insured. <u>Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.</u>, 592 Fed. App'x 803, 807 (11th Cir. 2014) (citing <u>Bankers Ins. Co. v. Macias</u>, 475 So.2d 1216, 1218 (Fla. 1985)). Before granting summary judgment on the question of untimely notice, "the record on such a motion should conclusively foreclose the insured's ability to overcome the presumption of prejudice." <u>Stark v. State Farm Florida Ins. Co.</u>, 95 So.3d 285 (Fla. 4th DCA 2012), <u>quoting</u>

---

[24]The Court notes that St. Paul has not identified facts outside Plaintiff's pleading that St. Paul needed to know in order to determine whether it had a duty to defend. Nor has it identified facts missing from the record which would inform St. Paul's decision whether it had a duty to indemnify.

Robinson v. Auto Owners Ins. Co., 718 So.2d 1283, 1285 (Fla. 2d DCA 1998) (internal quotations omitted). The record before the Court does not conclusively foreclose Plaintiff's ability to overcome the presumption of prejudice, in part because the Court is unable to determine that notice was untimely, as addressed below.

a. Notice to St. Paul

In support of its motion for summary judgment, St. Paul argues that it had no notice of the claim until June 2017 and offers an affidavit from one of its employees stating: "To the best of my knowledge, the named insured under St. Paul's Policies, did not provide Notice to St. Paul of the underlying tort incident, underlying tort litigation, or resultant verdict, nor did IAG make a claim for coverage under St. Paul's Policies for the underlying tort incident, or underlying tort litigation." (Affidavit of Amy M. Baker, Claim Professional in the Business Torts Claim Unit at The Travelers Indemnity Company, ECF No. 23-1, at ¶ 19)[25] The Affidavit contains no explanation of efforts made to investigate whether notice had been received, the insurer's custom for tracking such communications from an insured, or any other details relating to processing of claim notices. St. Paul also offers the deposition testimony of Ms. Cartwright, IAG's attorney for the first several years of the underlying litigation, who testified that she had no recollection of seeing the policy or being in contact with the insurer directly, and could not say whether her former client had provided notice to the insurer.[26]

_____

[25] According to St. Paul's Corporate Disclosure Statement, which has not been challenged, St. Paul "is 100% owned by The Travelers Companies, Inc." (ECF No. 12, at ¶ 1 n.1)

[26] Notably, St. Paul has not introduced evidence from Mr. Romm, IAG's former general counsel, which could have conclusively supported St. Paul's position that IAG failed to provide notice.

34

Plaintiff does not concede that notice was untimely. Relying on other evidence in the record, Plaintiff asserts that notice could have been provided as early as 2008 (when IAG stated it tried to contact its insurance agent) or 2012 (when Holland & Knight forwarded to Plaintiff's counsel the policy "received from" St. Paul). When analyzing a motion for summary judgment, the Court must draw all reasonable inferences in favor of, and consider facts in the light most favorable to, the nonmoving party. IAG and its counsel Ms. Cartwright, who as attorneys were informed as to Florida law requiring disclosure of relevant insurance information upon a demand from a potential claimant, apparently deemed that none of the insurance policies were relevant. A reasonable inference to be drawn is that they had, at minimum, obtained such policies for review, or they may have consulted with the insurer in order to determine whether such policies were relevant.

On the present record, the Court is unable to conclude that there is an absence of dispute as to the question of timely notice. While not engaging in a prohibited weighing of the evidence on summary judgment, the Court finds that St. Paul's self-serving affidavit that notice was not received has been disputed where Plaintiff identifies evidence that raises a reasonable inference that IAG notified St. Paul in August 2012 (four years before trial), and, in response, "received" from St. Paul the insurance policy, as a result of being ordered to provide that policy in the tort litigation.

b. Plaintiff's rebuttal of the presumption that St. Paul was prejudiced

Even if the record supported a finding of untimely notice, whether an insured has overcome the presumption of prejudice caused by late notice is generally reserved for the trier of fact. 1500 Coral Towers Ass'n, Inc. v. Citizens Prop. Ins. Corp., 112 So.3d 541, 544 (Fla. 3d DCA 2013). "[I]f an investigation conducted immediately following the occurrence would not have disclosed anything materially different from that disclosed by the delayed

investigation, the insurer may rebut the presumption. <u>Yacht Club</u>, 599 Fed. App'x, at 882 (internal quotations omitted). "The outcome of these 'delayed notice' cases ... ultimately depend[s] upon the facts and circumstances of each case." <u>Ala. Farm Bureau Mut. Cas. Inc. Co. v. Harris</u>, 197 So.2d 567, 570 (Fla. 3d DCA 1967).

 Reserving such questions for trial is particularly appropriate where an insurer asserts that it would have denied coverage even if the claim was timely. According to St. Paul's affidavit, even if it had been given timely notice, the claim would have been denied because the policies do not provide coverage for Plaintiff's loss.[27] (ECF No. 23-1, at ¶ 27). St. Paul made its determination that Plaintiff's claim is not covered under the policy by reviewing "the contents of available pleadings from the underlying tort action." (ECF No. 24-2, at 1) Of course, the policy and the pleadings are *all* that are required under Florida law for a determination of whether an insurer owes a duty to defend.[28] Not surprisingly in light of this requirement, the Eleventh Circuit has noted, in <u>Gemini II</u>, 592 Fed. App'x at 807, that if an insurer testifies that it would have denied the claim even if notice was timely, "perhaps that would ... raise[ ] an issue of fact sufficient to survive summary judgment" on the question of whether prejudice from untimely notice has been rebutted. <u>Id.</u> at 807 (emphasis added).

---

[27]In its Reply memorandum, St. Paul asserts that "coverage for this claim is clearly excluded" by the policy. (ECF No. 43, at 5) St. Paul made a similar argument in its Motion to Dismiss, that the policy "specifically excluded" Plaintiff's claim. "Plaintiff obtained a judgment for negligent hiring, training and supervision of an employee. That cause of action, and any damages awarded thereto, is specifically excluded by the primary Liability Policy and the Excess Policy's Employers Liability exclusion." (ECF No. 10, at p. 12 of 21)

[28]Plaintiff argues that because St. Paul investigated the claim and "determined that the claim is not covered" under the subject policy, St. Paul was not prejudiced and, by implication, there is no need to rebut any prejudice. Plaintiff's argument fails to account for the Eleventh Circuit's determination that an insurer's investigation and determination that there was no coverage under the complaint and the policy language does not eliminate the presumption of prejudice, which the insured must still rebut in order to proceed. <u>Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.</u>, 592 Fed. App'x 803, 807 (11th Cir. 2014).

i. Plaintiff has rebutted the presumption that St. Paul was prejudiced as to the ability to investigate the claim

Decisions awarding summary judgment to an insurer under Florida law on the issue of whether prejudice from untimely claim notice was rebutted turn on the question of the ability of the insurer to investigate the claim. The issues in these cases generally are presented by the insureds themselves, or the insureds' assignees, with no dispute that notice was untimely. In the instant proceeding, the insured is absent and has been so for years, and the Plaintiff disputes that notice was untimely.

More importantly, the decisions awarding summary judgment often rely on records of complete defaults by the insured in the tort litigation, with no discovery taken or any opportunity for the insurer to affect the outcome of the proceedings. This accords with Florida law, and common sense, as the purpose of the notice provision in insurance contracts is to allow an insurer to evaluate its rights and liabilities and to afford it an opportunity to make a timely investigation, Gemini II, 592 Fed. App'x at 806 (citations omitted).[29] Allowing insurers a presumption of prejudice

> does not mean that upon a showing of delay, alone, the insurer walks
> out of court free of potential claims. It means, rather, that prejudice
> being a difficult matter affirmatively to prove, it is not required to
> make such proof. Prejudice may be presumed, with the burden upon
> the one seeking to impose liability to show that no prejudice did, in
> fact, occur - for example, that a  complete investigation was made
> by another insurer or by competent persons who turned over results
> to the "late notice" insurer.

American Fire & Cas. Co. v. Collura, 163 So.2d 784, 792 (Fla. 2d DCA 1964) (quoting 8 Appleman, Insurance Law and Practice, § 4732, pp. 15-17).

---

[29]Accordingly, where evidence has been offered tending to show that an insurer had sufficient opportunity to investigate the claim, that "presents a fact intensive issue not suitable for resolution in deciding a motion for summary judgment." Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc., No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728 (M.D. Fla. Feb. 11, 2002) (no litigation was pending against insured at time insured provided admittedly late notice of claim to insurer).

None of the cases cited by St. Paul are to the contrary. For example, in <u>Gemini</u> <u>II</u>, the claimant first discovered the insurance policy during post judgment discovery, seven months after entry of a default judgment against the insured (who had ignored the litigation), and then the insurer informed its insured that the claim was denied. Several months later, the claimant, possessing a judgment, filed a declaratory action against the insurer and also alleged a third-party beneficiary claim for breach of the insurance contract. The court affirmed the award of summary judgment in favor of the insurer on the basis that it had received late notice. That case is distinguishable from the present proceeding, because in <u>Gemini II</u> the claimant conceded that notice to the insurer was untimely, and the insurer's compelling evidence that it had been prejudiced by that late notice was unrebutted. <u>Id.</u>, at 806-807. Specifically, the insurer's corporate representative testified that had the insurer been given timely notice it could have retained experts regarding the alleged amount of damages, and defended the underlying lawsuit, such that a default judgment would have been avoided. In contrast, in the present case IAG was represented for many years by counsel who defended against Plaintiff's claim, and St. Paul has offered no evidence as to what it would have done differently during the years of litigation where IAG was represented by counsel. In addition, St. Paul had notice of the claim before final judgment was entered, and Plaintiff has demonstrated that St. Paul could have sought relief from that judgment.[30]

In <u>Yacht Club</u>, 599 Fed. App'x. 875, the court affirmed the grant of summary judgment for an insurer where prejudice from untimely notice of a property damage claim had not been rebutted. In that case, the claimant had repaired some of the damaged property prior to the insurer being notified of the claim and then, to rebut the prejudice presumptively suffered by the insurer, relied only on the fact that the parties' experts had varying opinions

---

[30]The court noted in <u>Gemini II</u> that if the insurer had taken the position, as St. Paul did here, that it would have denied coverage even if the notice was timely, then that could have supported a finding that a triable fact existed as to prejudice. <u>Id.</u>, 592 Fed. App'x. at 807.

as to causation of the original damage. The insurer had never denied the claim on substantive grounds, and instead argued, successfully, that it need not provide coverage based on the prejudice it presumptively suffered from the effects of time on the damaged property. Id. at 881-82.

Finally, in Aseff v. Catlin Speciality Ins. Co., 115 F. Supp. 3d 1364 (S.D. Fla. 2015), the court concluded that notice provided four years after the accident and three years after the underlying wrongful death suit was filed was untimely, where the insured had failed to defend the case, conducted no discovery on the issue of liability or damages, had not sought the victim's medical records, and had not inspected, nor preserved, the equipment involved in the accident. The court observed that "[w]hen considering the question of prejudice, the focus is on whether the delayed notice has frustrated the underlying purpose of the notice provision," Aseff, 115 F. Supp. 3d at 1370, citing 1500 Coral Towers Ass'n, Inc. v. Citizens Prop. Ins. Corp., 112 So.3d 541, 544 (Fla. 3d DCA 2013), and concluded the insurer had been precluded from conducting a proper investigation into the accident. Id., at 1371.[31]

In summary, St. Paul indisputably had notice of the claim prior to entry of final judgment and had access to the record of defense provided to IAG by its counsel Ms. Cartwright and her law firm, as is evident from the evidence offered in this proceeding. There is no suggestion of anything "materially different" that would have been disclosed to St. Paul if it were involved in the investigation earlier. Where an insurer has an opportunity

---

[31]In Aseff, the court noted Florida law that allows a party to overcome the presumption of prejudice "by showing that an investigation conducted immediately following the accident would not have disclosed anything materially different from that disclosed by the delayed investigation, and thus the outcome of the liability suit would not have been different had the notice of the accident been received timely." Id., at 1370-71 (quoting Niesz v. Albright, 217 So.2d 606, 608 (Fla. DCA 1969)). The court nevertheless held that plaintiff "cannot rebut the presumption of prejudice," as no reasonable fact finder could determine that the insurer was not prejudiced. Aseff, at 1371.

to investigate a claim and deny it on other grounds than late notice, that "effectively rebuts any presumption of prejudice arising from the late notice." Keenan Hopkins Schmidt and Stowell Contractors, Inc. v. Continental Cas. Co., 653 F. Supp. 2d 1255, 1263 (M.D. Fla. 2009) (despite late notice, insurer still had multiple months to investigate claim and then denied claim on two grounds). At a minimum, Plaintiff has raised a genuine dispute as to the material facts regarding prejudice.

ii. St. Paul was notified in time to challenge entry of final judgment or seek to set it aside

A party suffering a contractual breach is obligated to take reasonable means to protect itself and mitigate its damages. Thomas v. W. World Ins. Co., 343 So.2d 1298, 1303 (Fla. 2d DCA 1977).[32] At the very latest, St. Paul was served with the state court's Notice of appearance in June 2017, approximately two months prior to entry of the Final Judgment. St. Paul claims that an example of the prejudice it suffered is that the jury awarded damages for the intentional infliction of emotional distress even though such claim had been dismissed from the case. (See Order dismissing with prejudice Counts II, III and IV of the Third Amended Complaint, Oct. 7, 2010, ECF No. 38-8[33]) Plaintiff persuasively counters St. Paul's argument, by demonstrating that St. Paul could have sought to intervene in the case prior to, or after, entry of the Final Judgment to set aside that portion of the verdict as based on mistake. Unlike the insurer in Hamid Mohebbi Pharm.D v. Founders Ins. Co., 41 F. Supp. 3d 1412, 1417-18 (S.D. Fla. 2014), where a default judgment was entered two years prior to

---

[32]When an insurer who received late notice of a claim denied a request to defend its insured, and refused an offer to have the default set aside so that the insurer could provide a defense, a court has found the presumption of prejudice successfully rebutted. Ala. Farm Bureau Mut. Cas. Inc. Co. v. Harris, 197 So.2d 567, 570 (Fa. 3d DCA 1967).

[33]The Court takes judicial notice of the proceedings before the state court. Rule 201(b), Fed. R. Evid., permits judicial notice of documents from another court for the purpose of recognizing that such litigation and filings occurred, which is a matter of public record.

the insurer being advised, St. Paul had the ability, and still does, to seek relief under Fla. R.

Civ. P. 1.540.[34]

St. Paul also could have sought to intervene, pursuant to Rule 1.230, Fla. R.

Civ. P., even after entry of judgment. In <u>Great Am. Ins. Co. v. Bevis</u>, 652 So. 2d 382, 384

(Fla. 2d DCA 1995), citing <u>U.S. Fire Ins. Co. v. Ted Satter Enterprises, Inc.</u>, 447 So.2d 1032

(Fla. 4th DCA 1984), the court held that a liability insurer should have been permitted to

intervene almost one year after judgment was entered, despite the insurer's refusal to defend

the insured at the outset of the litigation, where the insurer claimed that the default judgment

should be set aside for lack of service on its insured. Florida courts also have found

intervention should be permitted where an insurer alleges that its insured and the plaintiff

colluded to reframe the pleadings to make the claim subject to coverage under the policy.

<u>British Aviation Ins. Co. Ltd. v. Menut</u>, 511 So.2d 425 (Fla. 4th DCA 1987) (reversing trial

court denial of motion to intervene).[35]


<u>iii. No evidence has been offered as to what St. Paul would have done differently</u>

The Court has reviewed the entire record in this case, consistent with Rule

56(c)(3), which allows the Court to consider "other materials in the record," including the

materials regarding work performed by Holland & Knight on IAG's behalf. If St. Paul had

---

[34]According to Rule 1.540, Fla. R. Civ. P., a motion to set aside a judgment can be made, within one year of entry of a judgment, for the following reasons, among others: mistake, excusable neglect, or newly discovered evidence. Such motion can be filed by a party or a party's legal representative, and courts have permitted a liability insurer to do so, *e.g.*, when the insurer's basis for the motion is that the judgment was obtained by fraud or collusion and the judgment directly affects the insurer's rights. <u>Gotham Insur. Co. v. Matthew</u>, 179 So. 3d 437, 441 (Fla. 5th DCA 2015).

[35]Florida courts have refused to allow insurers to intervene, however, where the insurer sought to inject new issues of coverage defenses or timely notice to the insurer, <u>see</u>, <u>e.g.</u>, <u>Allstate Ins. Co. v. Johnson</u>, 483 So.2d 524 (Fla. 5th DCA 1986), as declaratory actions are available for resolution of such issues.

41

timely notice and determined that it owed a duty to defend, it arguably would have provided a defense in the state court action comparable to the defense provided by IAG's general counsel and trial counsel. During those first several years, discovery was conducted, IAG obtained dismissal with prejudice of Plaintiff's intentional tort claims in October 2010, and the parties were set for a mediation in 2015. St. Paul offers no evidence as to what it would have done in the tort litigation if it provided defense coverage to IAG. In Walker & Co. General Contractors, Inc. v. Transcontinental Ins. Co., No. 6:05-CV-1745-Orl-31KRS, 2007 WL 569855 (M.D. Fla. Feb. 20, 2007), the court denied summary judgment to an insurer, finding disputed facts as to the issue of prejudice where the insured argued persuasively that by the insured hiring "a competent law firm to investigate and defend against the original complaint" in the tort action, the insurer had suffered no prejudice. This Court agrees with that observation, and it is equally applicable to the facts of this proceeding.

Where, as here, the claimant is proceeding without the insured, and has demonstrated a triable question remains on the fact-intensive issue of whether prejudice has been rebutted, denial of summary judgment is appropriate. Even though it is an insured's burden to rebut the presumption of prejudice, it remains St. Paul's burden to show why it is entitled to a summary determination of that issue rather than proceeding to a bench trial. In light of this record, the Court finds that trial is required as to the question of whether, if notice indeed was untimely, Plaintiff has rebutted the presumption of prejudice flowing from such untimely notice.

c. Application of equitable principles

The equitable principles underlying Florida's proceedings supplementary statute compel this Court to make the following observations.

42

i. Plaintiff did not delay in seeking insurance information

There is no evidence that Ms. Walton delayed in pursuing her claim against IAG nor in seeking insurance information from IAG. The assault by Mr. Dames took place in August 2007. Four months later, Plaintiff already had pursued her administrative remedies with the EEOC, and filed her initial complaint. On May 14, 2008, her counsel submitted a written request for IAG's insurance information, which is subject to disclosure pursuant to Fla. Stat.§ 627.4137. Plaintiff also repeated her request in discovery, and continued to request such information, which the court ultimately, four years later, ordered IAG to provide. Defendant argues that Plaintiff had some duty to advise the insurer, but offers no precedent establishing such a duty.

Indeed, it would be reasonable for Plaintiff to have presumed that because IAG failed to continue to defend the case, St. Paul had declined coverage to IAG. Under such circumstances, and in light of Florida's nonjoinder statute, Plaintiff was required to wait until she obtained a verdict before adding St. Paul as an impleaded defendant, which is what Plaintiff has done. To force her to prove, years later, that notice was given by IAG, a party over whom Plaintiff has never had control nor has she been aligned with, puts her at a significant disadvantage. In contrast, St. Paul offers a conclusory statement that "notice was not given," but offers no evidence, for example, of efforts it undertook to review its records to verify that notice was never received. St. Paul offered the correspondence from Ms. Cartwright which leads to a reasonable inference that St. Paul was asked for a copy of the insurance policy in 2012; however, St. Paul has not offered testimony from the single individual most likely to have direct knowledge of whether notice was provided: Mr. Romm.

Further, the Court reasonably infers from the fact that IAG refused to produce its insurance policy that IAG believed the policy might provide coverage, as there would be no reason not to produce the policy if Plaintiff's claim clearly was not covered. This inference

43

is also supported by correspondence between Mr. Romm and Ms. Cartwright on November 17, 2008, offered by St. Paul and produced by Ms. Cartwright in this litigation. Ms. Cartwright asked Mr. Romm "[a]re the pending claims covered by any existing IAG insurance policy?" Mr. Romm responded:

> I doubt it. What do you think? Would they? What if we just said 'NO.' I know there is a statute that gives them the right to ask for the policies but I also know that the statute does not have a remedy clause built in so it has no teeth. I don't feel comfortable giving them our policies. *They want the policy because they are hoping if the insurance company gets involved that they would be willing to fork over some money whereas Mr. Weinsoff is not.* Or do you have a different read on this?

Ms. Cartwright replied: "If we get to discovery, you will have to send it over. Do you have a policy that would cover the intentional or negligent torts alleged in the complaint?" (ECF No. 38-7) (emphasis added)[36] When IAG objected in November 2010, through counsel, to Plaintiff's request for production of the policy, apparently IAG had reviewed its policies and determined that they were not relevant. This Court can infer from the state court's directive to IAG in 2012 to produce its insurance policy that the court agreed with Plaintiff that such information was relevant.[37]

Considering the absence of evidence that Plaintiff was less than diligent, and the evidence that both the insured (in obstructing efforts to obtain its insurance policy) and insurer (in removing this case improperly and failing to take steps to promptly address the

---

[36]Notably, although the case proceeded to discovery and beyond, IAG maintained its objection to disclosing its insurance policy until such objections were eliminated by court order in August 2012.

[37]The Court can draw only conflicting inferences from IAG's adamant refusal to disclose its insurance policy to Plaintiff. Perhaps IAG believed coverage existed and wanted to avoid any consequences of submitting the claim to its insurer (*e.g.*, increased premiums for future insurance, costs for any part of claim not covered, *etc.*), or hoped to expeditiously resolve the litigation without the insurer's involvement, or had been told by the insurer that there was no coverage. None of these conjectures merit discussion here.

coverage dispute) showed a lack of diligence, the equities support a finding that this proceeding supplementary is ill-suited for summary judgment.

ii. There is no evidence that Plaintiff colluded with the insured

           St. Paul complains of "Plaintiff's significant advantage" of having participated in the underlying litigation, which implicitly suggests that Plaintiff colluded with IAG to keep the insurer out of the litigation. The undisputed facts of this case do not remotely suggest collusion between Plaintiff and IAG.[38] Plaintiff repeatedly asked for insurance information and was rebuffed, despite a legal obligation of the insured and its attorney (and its insurer, upon notice) to disclose that information. Any "advantage" Plaintiff enjoyed can only be attributed to IAG's alleged failure to provide notice of the claim to St. Paul. St. Paul claims that it was prejudiced by untimely notice of the claim and that there is no evidence to rebut that prejudice, but St. Paul also refused to take action in the litigation later that possibly would have resulted in elimination of any alleged prejudice it suffered. According to St. Paul, it need not do so because the claim was not covered, even if notice had been timely. Instead, St. Paul quickly obtained a default judgment in a declaratory action against its insured (a dissolved) entity, and then dismissed that case, without allowing Plaintiff's position as to coverage to be adjudicated.

           This "heads I win, tails you lose" approach by an insurer is nearly impossible for a third party to overcome, regardless of the merits of their claim for coverage under an insurance contract. On the one hand, by removing this case and arguing that the untimely notice was prejudicial and that no evidence can rebut the prejudice, and avoiding proceeding

---

[38]For example, after receipt of the insurance policy in August 2012, and after IAG's answer was stricken from the record in 2013, Plaintiff could have sought leave to reframe her complaint to plead specific language that mirrored the policy provisions in order to avoid any chance that coverage ultimately was declined. She did not do so.

in state court where such prejudice could be more readily determined or disproved, the insurer effectively rewards its insured's flaunting of Florida law requiring that notice be given, even in cases where the claim clearly would have been covered. On the other hand, by asserting that it would deny coverage for the claim in any event and promptly obtaining a default judgment against its dissolved insured, declaring that there was no duty to defend the action, the insurer again effectively rewards its insured's misconduct and insulates its own coverage determination from judicial review.

In light of the equitable principles of this proceeding, and the unusual facts presented which reveal a lack of wrongdoing by the injured Plaintiff, the Court recommends that the decision as to whether notice was untimely, and if notice was untimely, whether Plaintiff has rebutted the presumption of prejudice, should be decided by a trier of fact rather than on summary judgment.

## V. CONCLUSION

For the foregoing reasons, it is RECOMMENDED that:

1.  the case be remanded to state court for lack of subject matter jurisdiction or, in the alternative,

2.  Defendant's Motion for Summary Judgment (ECF No. 39) be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in

the interest of justice.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

        DONE AND SUBMITTED at Fort Lauderdale, Florida, this 10th day of August, 2018.

_____

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record

47